Filed 12/4/20  P. v. Boukes CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072973 |
| v. | (Super.Ct.No. BAF1600917) |
| NOY ESTUL BOUKES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost and Michael B. Donner, Judges.  Affirmed with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Noy Estul Boukes is a member of the white supremacist COORS Family Skins gang. He took his friend Jason Popovich, who was also a member of the gang or at least a "hang-around," to an isolated area of Hemet and shot and killed him over a $550 drug debt owed to the Aryan Brotherhood prison gang. When Popovich's girlfriend tried to get out of the car to help Popovich, defendant threatened her with a gun, told her to get back in the car, and kept her from leaving. Defendant was convicted of first degree murder, making a criminal threat, and false imprisonment; a jury found true, inter alia, a gang special circumstance and gang enhancements; and defendant admitted he had suffered two prior strike convictions and three prior prison terms. The trial court sentenced defendant to state prison for life without the possibility of parole plus 78 years to life.

On appeal, defendant argues: (1) the trial court erred by conducting in camera hearings to determine whether to order the disclosure of a written agreement between a confidential informant (CI) and the Riverside County Sheriff's Department (department), and he asks that we independently review the sealed transcripts of those hearings; (2) the jury's true findings on the gang special circumstance and gang enhancements are not supported by substantial evidence that the crimes were committed with the intent to further and benefit the activities of defendant's own gang, as opposed to benefiting him personally as well as the Aryan Brotherhood; (3) an instruction given, that the jury was not required to find defendant had a motive for any of the charged offenses, conflicted with the instructions given for the gang special circumstance, which did require a finding that defendant committed the murder to further the activities of his gang; and (4) three

2

one-year enhancements imposed for his three prior prison terms must be stricken in light of a recent statutory amendment limiting the enhancement to violent sex offenses.

We have conducted an independent review of the sealed transcripts of the in camera hearings and find no error; we conclude substantial evidence does support the gang special circumstance and sentence enhancements; and we find no instructional error. The People concede, and we agree, defendant's three one-year enhancements for his admitted prison terms must be stricken. We will remand for the trial court to strike them. In addition, the trial court did not sentence defendant for the jury's true findings on the gang enhancements related to defendant's convictions for making a criminal threat and false imprisonment. On remand, the trial court shall either sentence defendant on the true findings, impose the sentence but strike the punishment in the interest of justice, or strike the enhancements entirely. In all other respects, the judgment is affirmed.

I.

PROCEDURAL BACKGROUND

The People charged defendant with the first degree murder of Popovich (Pen. Code,[1] § 187, subd. (a), count 1), threatening Heather D. (§ 422, count 2), and falsely imprisoning Heather D. (§ 236, count 3). The People alleged the special circumstance that defendant intentionally murdered Popovich while he was an active member of a criminal street gang and with the intent to further the activities of the gang. (§ 190.2, subd. (a)(22).) In addition, the People alleged defendant personally discharged a firearm

---

[1] Unless otherwise stated, all statutory references are to the Penal Code.

3

during the commission of the murder and proximately caused great bodily injury or death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)) and counts 2 and 3 were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to further the activities of the gang. (§ 186.22, subd. (b)(1)(A).) Finally, the People alleged defendant served three prior prison terms (§ 667.5, subd. (b)) and suffered two prior convictions for serious or violent felonies, for the purposes of sentencing under the three strikes law. (§§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2)(A).)

A jury found defendant guilty on all three counts and rendered true findings on all sentencing allegations. In a separate proceeding, defendant admitted to having served three prior prison terms and to having suffered two strike convictions. The trial court sentenced defendant to state prison for life without the possibility of parole for his conviction for special circumstance murder; an indeterminate term of 25 years to life for the firearm use enhancement and, under the three strikes law, consecutive terms of 25 years to life for each of his convictions on counts 2 and 3, for a total indeterminate

term of 75 years to life; and three years for his admission to having served three prior

prison terms.[2]

Defendant timely appealed.

## II.

## FACTS

*A.    Background.*

In July 2016, Heather D. and Popovich had been dating for about a year.  Heather

had known Ashlee T. since high school, and she knew defendant (who went by the

moniker "Bones") through the father of her child.  Defendant was a member of a

---

[2]  The trial court did not sentence defendant for the jury's true findings on the gang enhancements for counts 2 and 3.  The probation department did not file a sentencing recommendation, and the sentencing briefs submitted by defendant and the prosecutor did not recommend a sentence for the gang enhancements either.

"It is well-established in California by a long line of decisional authority . . . that a trial court's failure either (1) to pronounce sentence on a statutory sentence-enhancement allegation based upon a finding by the trier of fact or an admission by the defendant that the allegation is true, or (2) to exercise its discretion—to the extent imposition of the enhancement is discretionary—to either strike the enhancement allegation or impose the enhancement, results in an unauthorized sentence."  (*People v. Vizcarra* (2015) 236 Cal.App.4th 422, 432.)  An unauthorized sentence is subject to correction by an appellate court whenever the error comes to its attention.  (*Ibid.*)

We find nothing in the record to indicate what the trial court may have intended to do with the true findings on the gang enhancements.  Therefore, we remand for the trial court to exercise its discretion in the first instance and determine whether to:  (1) sentence defendant to state prison for two, three, or four years for the jury's true findings on the gang enhancement allegations on counts 2 and 3 (§ 186.22, subd. (b)(1)(A)); (2) exercise its discretion to impose a sentence for the true findings but strike the punishment in the interest of justice so long as it states the reasons for doing so on the record (§ 186.22, subd. (g)); or (3) exercise its discretion under section 1385 to dismiss entirely the gang sentencing allegations in the interest of justice.  (*People v. Fuentes* (2016) 1 Cal.5th 218, 222, 231 [holding trial courts have jurisdiction to strike gang enhancements under § 1385].)

5

skinhead group, COORS (Comrades of Our Racial Struggle) or COORS Family Skins, and Popovich was either a member or at least a "hang-around."[3]  Heather and Popovich used heroin daily.

Sometime in 2016, defendant approached Richard A. (a drug user with a felony conviction for drug sales) and said he was there to "tax" Richard every week on behalf of the Aryan Brotherhood.[4]  Defendant demanded $125, but Richard gave him nothing.  In a second incident, defendant went to Richard's home unannounced and again demanded $125.  Richard told defendant to get out, and defendant said he "would regret it."  And during a third encounter, defendant went uninvited to Richard's home at 3:00 a.m., walked through Richard's partly open garage door, and once more demanded $125 on behalf of the Aryan Brotherhood.  Richard pulled out a gun and told defendant, "get out of my fucking house."  Defendant replied, "You're going to regret this."

John G. (who went by the moniker "Folks") lived in Hemet and knew Popovich, Heather, Ashlee, and defendant; he had sold them drugs.  They were all part of the same social circle, would hang out, and (except for Ashlee) use heroin and methamphetamine together.  In addition to his construction job, John was a paid CI for the department.  Sometime before the murder, defendant told John that Popovich was not answering his

[3]  Heather denied she was also a member, though her e-mail address and social media accounts had numerous references to COORS and its symbols.

[4]  Richard testified he did not owe money to defendant or to the Aryan Brotherhood and, on the street, "tax" means "[g]etting money out of somebody for something they owe."  He had never been taxed by anyone before, and he had no idea why the Aryan Brotherhood would want to tax him.  He characterized himself as a "low-level drug dealer" with no connection to a larger organization.

6

calls about $550 he owed "to his big homies"—the Aryan Brotherhood—and defendant "was getting really pissed off about it."[5]  Defendant said Popovich had been "put in the hat," meaning he was in trouble with the Aryan Brotherhood.  John offered to pay Popovich's debt and told defendant "he didn't have to do that shit."  But defendant did not take the money.

       B.       *Evening of July 18 and Early Morning Hours of July 19, 2016:  the Murder.*

On the evening of July 18, 2016, Heather and Popovich were at a friend's house. Heather called defendant around 10:23 p.m. to come get them.  Ashlee and defendant came and picked them up in her car.  Ashlee drove, defendant sat in the front passenger seat, and Heather and Popovich sat in the back seat along with Heather's pit bull.  The plan was to get something to eat.  They stopped at a Chevron station at the intersection of Florida and Lincoln in Valle Vista at 12:10 a.m., Ashlee, Heather, and Popovich got out and bought water, cigarettes, and lottery tickets.  Ashlee pulled out of the gas station at 12:21 a.m.  Heather did not know where they were going.  Two minutes later, they drove past a Shell gas station on Lincoln, which was one mile away from the Chevron station.

Ashlee stopped the car on a dead-end street in Valle Vista, about half a mile from the Shell station, and Popovich and defendant got out.  Heather was in the back seat, "probably doing drugs."  She then heard two gunshots close to the vehicle.  Heather heard no struggle or arguing before the gunshots, and she had not seen defendant with a

_____

[5] John believed the money was originally owed to defendant himself.

7

weapon. Heather opened the car door, and her pit bull got out and ran loose. Defendant told her to get back in the car. When Heather again tried to get out, defendant pointed a gun at her and said, "shut the fuck up and get back in the car," and then pushed her back inside.

Although it was dark out, Heather saw someone in their yard with a flashlight. One of two residents who heard the gunshots approached the car, pointing a flashlight, and saw Popovich lying on the ground a few feet from the trunk of the car. Defendant crouched down, pulled what appeared to be a jacket over his head, then backed around to the passenger side of the car, and got in. Defendant told Heather to "shut the fuck up or he's going to kill [her] too." Heather did not see Popovich get shot or know who had shot him, but she assumed he had been shot because he did not get back into the car. They then drove off.

The two residents who had heard the gunshots saw the car back up to the main road. The resident with the flashlight walked over and saw that Popovich was lifeless. He also saw a dog lingering around the body and did not recognize it from the area.

C.      *Morning of July 19, 2016: Defendant's Actions After the Murder.*

Ashlee stopped at the home of her friend Brendan. She and defendant switched from Ashlee's car into Brendan's truck or SUV. Heather stayed at Brendan's. As they drove, the vehicle got a flat tire near John's home. Around 1:45 a.m., John's wife woke him up and said defendant and Ashlee were at the front door. John let them inside and told Ashlee to sit on the couch. John went to the garage to talk to defendant.

Defendant used a paper towel to wipe off what appeared to be blood from his clothing. He told John, "I did that fool," meaning he killed Popovich. He told John he had tried to put the body in the back of the car but had to leave it. Defendant said, "he was going to get rid of the two people that seen him kill [Popovich]." Specifically, defendant said he was going to kill or "smoke them" because they were the only two witnesses to the murder. John told defendant that Heather and Ashlee did not deserve to die, and defendant was not "thinking things through" because Ashlee's uncle was a respected member of another skinhead gang.[6]

Defendant gave John a box with a revolver inside and asked him to get rid of it. John told defendant to leave and said he did not want the gun in his house. However, John offered to grind the gun down so defendant could get rid of the gun in pieces, and defendant left it there when he and Ashlee left. John immediately tried calling and texting Investigator Garcia, his contact with the department, but he got no answer.

At 5:45 that same morning, defendant returned to John's house with Brendan, Ashlee, and Heather. Brendan, who seemed shaken up and nervous, walked in first and, referring to defendant, said, "That fool is trippin'." John spoke to defendant in the garage, and defendant said he wanted his gun back. John then walked to Brendan's truck and told Heather to get out of the vehicle. Heather appeared to be upset and looked like she had been crying. Defendant was irritated at John for getting Heather out of the

---

[6] John's testimony was not entirely clear whether defendant spoke of killing Ashlee and Heather when he first came to John's house at 1:45 a.m., or whether he said it later at 5:45 a.m. But on redirect, John testified defendant did make those statements.

9

vehicle, but John did it anyway. John gave defendant the box with the gun and told defendant not to come back to his house.

Heather told John that defendant had killed Popovich, she felt guilty about telling defendant where she and Popovich had been, and defendant said he was going to kill her too. John took Heather to a local motel and rented a room for her. He stayed with her for about half an hour then went back home.

### D.     The Investigation.

Officers, who responded to the 911 call about shots fired, discovered Popovich lying on the pavement of Araucana Street, in a pool of blood. Popovich had a gunshot wound on the top right side of his head, what appeared to be a large exit wound on the top of his head, and a gunshot wound on his back between the shoulder blades. A bullet was found under his body when he was turned over. Nothing indicated the body had been moved, and it appeared he had been shot and died where he fell.

What appeared to be a copper fragment of a bullet jacket was discovered in the middle of the street. Tire impressions similar to the tread on Ashlee's tires were found near the body in patches of dirt on the roadway. To the right of the body, on the pavement and a curb, investigators found bloody partial shoe impressions that were consistent with the soles of defendant's shoes. Officers found no shell casings.

A postmortem examination of the body revealed the bullet that entered Popovich's back passed through his spinal cord and exited just below his Adam's apple. The bullet that entered the top right side of the head, passed through the brain, and exited the left side of his head.

Defendant and Ashlee were stopped by officers the day of the murder and taken into custody. Defendant was visibly nervous, shaking uncontrollably, and sweating. He kept asking why the officers had stopped him and why he was being arrested. Defendant had what appeared to be heroin in his pockets. Ashlee had a pipe for smoking methamphetamine. The sole to defendant's right shoe appeared to have blood on it. The shoes later tested positive for the presence of blood, and DNA in the blood was consistent with Popovich's DNA. What appeared to be a spot of blood on the right front leg of defendant's shorts presumptively tested positive for blood. The front passenger seat floorboard of Ashlee's car reacted positively when sprayed with a chemical reagent used to detect the presence of blood.

John was interviewed at the sheriff's station the evening after the murder. He told officers defendant had used a towel to wipe off blood and had thrown the towel in a trash can. John also told the officers defendant had two spent .357 bullet casings with him, and he may have thrown them in the trash. Officers searched John's house but found no bloody towel or spent shell casings.

After the murder, Heather communicated with John's wife through social media and told her, "I'm so lucky . . . John stood up for me . . . otherwise I would be dead too." Heather also communicated with Richard, telling him, "I'm straight fucked up grieving over JP getting murdered in front of me," and "I wanted to help JP, but I had a gun in my face telling me to get back in the car." During the same conversation with Richard, Heather wrote, "Real shit. Bones a [N word], if you ask me what kind of friend does that to a person you claim to be your comrade?" Heather believed Popovich had been a loyal

11

friend and comrade to defendant.  And to another friend, she wrote, "By his own fucking comrade, I don't trust now because of what happened."  She did not set Popovich up to be murdered, and she defended herself on social media from accusations that she had.

From county jail, defendant spoke to Matthew J.  The two discussed Kern Valley, the location of a state prison, where they had "friends."  At the time of the call, a suspected "shot-caller" for COORS was incarcerated in Kern Valley.  Defendant said, "I may be getting . . . a rock.  You know, like over all that."  A "rock" or "shamrock" is a green, three-leaf clover tattoo worn by members of the Aryan Brotherhood.

Defendant also spoke to Ashlee from jail.  He told her, "if it wasn't for that other person in the car," i.e., Heather, "I wouldn't even be here."  Defendant also said, "I'm not going to beat this shit, but I'm just hoping I get involuntary manslaughter or something, you know, and get a good deal."  And in another phone conversation with Ashlee, defendant said if he were bailed out of jail, he would flee.  Defendant and Ashlee agreed that "they should have already left."

III.

DISCUSSION

A.     *The Trial Court Properly Conducted In Camera Hearings on Defendant's Motion to Compel Disclosure of Documents in John G.'s CI File and Properly Limited Its Disclosure Order to a Redacted Copy of the CI Agreement and Information Sheet*.

Defendant appears to contend the trial court erred by reviewing in camera, and outside defendant and his attorney's presence, records pertaining to the department's CI,

12

John G.[7]  He requests that we review the sealed transcripts of the in camera hearings to determine whether the trial court should have ordered the department to disclose additional documents.  The People contend we need not review the sealed transcripts because defendant obtained the document he requested, so no harm, no foul.  We have reviewed the transcripts of the in camera hearings and find no error.

### 1.    *Additional background.*

Before his preliminary examination, defendant moved for an order compelling the prosecutor to provide discovery, including "all written informant agreements made between witness John [G.] and any law enforcement agency, including the Riverside County Sheriff's Department."  The prosecutor had already informed defendant that John was the CI described in relevant police reports and he would testify at the preliminary examination.  Although the prosecutor had provided defense counsel with John's videotaped interview by police and with written records detailing the two times he had provided information to the department, the prosecutor declined to provide a copy of the CI agreement.  In supplemental points and authorities and in a motion for disclosure of

---

**7** Defendant asserts in his opening brief that "the trial court failed to abide by the proper procedures for conducting an in camera hearing," and he seems to suggest it was inappropriate for the court to review the CI file in a "sealed" proceeding from which he and his attorney were excluded.  But, during oral argument, defendant's attorney informed us that his challenge to the trial court's disclosure order is merely to the scope of the order, and not necessarily to the court's decision to hold an in camera hearing in the first place.  To the extent a challenge to the procedures employed by the trial court is at least implicit in defendant's briefs, we will address it in this opinion.

*Brady*[8] information, defendant again requested the trial court order the prosecutor to provide him with a copy of the CI agreement between John and the department.

In his written opposition, the prosecutor argued the CI agreement was not in his possession, was irrelevant, and it was cumulative to the information already provided to defendant about John. The prosecutor explained how John came to be an informant for the department and the information he provided in this case, for which John was paid $950. The department paid John $200 for information he provided in a separate case. The prosecutor described the CI agreement as "an internal department form, which is primarily utilized to track informants and record their personal identifying information, as well as to document any payments made to them." According to the prosecutor, such agreements are "never turned over to an outside agency." The personal identifying information contained in the form is used to assist law enforcement in locating an informant "and is not pertinent to the witness's credibility." Moreover, the prosecutor argued disclosure of John's personal information "would further potentially jeopardize the safety of the informant and [his] family members." In addition, the prosecutor argued the CI agreement was covered by the official information privilege in Evidence Code section 1040 and, if the court felt the need to examine the documents, to determine whether it was in whole or in part privileged, it should do so in camera.

---

[8] *Brady v. Maryland* (1963) 373 U.S. 83 (criminal defendant has a due process right to be informed of exculpatory evidence and evidence that may be used to impeach prosecution witnesses).

14

In the first hearing on defendant's request, defense counsel argued the *Pitchess*[9] procedure for determining whether to disclose confidential peace officer records was inapplicable to his motion. The prosecutor agreed *Pitchess* did not apply but asked the trial court to deny the motion outright because (1) the CI agreement was not relevant or exculpatory, (2) it was not in the district attorney's possession, and (3) it was privileged. The prosecutor explained he had merely suggested in his opposition that if the court believed it needed to review the document, it should do so "in-chambers." Defense counsel responded that the prosecutor had a duty to disclose the CI agreement even though it was in the possession of the department and, because John was the prosecutor's "star witness," the agreement and what John was paid for providing information were relevant to impeaching his testimony. After hearing additional arguments from counsel, the trial court directed defense counsel to issue a subpoena to the department for production of the CI agreement and continued the hearing on defendant's motion to compel.

At the continued hearing, an investigator with the department testified John was under contract as a CI, and the department would invoke the official information and CI privileges. The court ordered the investigator to produce the CI agreement "in chambers subject to review by the Court."

During the in camera hearing, the investigator testified the CI agreement was a standard contract the department used for informants. The investigator produced a folder

---

[9] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

15

for John that contained an informant identification record, a mugshot, a Department of Motor Vehicles record printout, and various police agency records/reports. In addition, the folder contained the CI agreement, an informant worksheet or running log of when John spoke to department personnel and the nature of the conversations, and a two-page record of payments made to John. The investigator testified that, because John was part of a violent gang and had ties to a prison gang, he and/or his family would be in danger if the agreement and its contents were disclosed. The trial court indicated it was inclined to order the disclosure of the CI agreement to defendant with or without redactions but gave the department the opportunity to contact its attorneys to further assert a privilege.

Back on the record in open court, the trial court indicated the investigator had invoked the CI privilege under Evidence Code section 1042, and the court had reviewed John's file, which included the CI agreement. Because a deputy county counsel could not appear that day, the trial court continued the hearing.

During an in camera hearing conducted the following day, a deputy county counsel invoked the official information privilege and argued none of the contents of John's CI file were relevant to the case. The trial court indicated it had already concluded that the CI agreement and one-page informant information sheet were relevant and should be disclosed subject to redaction, but the remainder of the file was not relevant and material and, therefore, would not be disclosed. The deputy county counsel again argued that the CI agreement was not relevant and explained the agreement was not necessarily a contract but was an agreement that John would abide by certain rules while providing information for pay. After conferring with officials from the department, the

16

deputy county counsel informed the court that, while maintaining its privilege objections, the department would provide defendant with a copy of the CI agreement but requested that the court order a redaction of the name of an undercover officer.

On the record in open court, the deputy county counsel once more invoked the official information privilege and argued that the CI agreement was not relevant. The deputy county counsel informed the court that redacted copies had been prepared. Therefore, the trial court ordered the department to produce to defendant the one-page "Cooperating Individual Agreement," which the court described "as an 'agreement' by the confidential informant to abide by certain standards of conduct with respect to work as a confidential informant," and to produce the one-page "Confidential Informant Information Sheet."

2. *The trial court properly reviewed the CI file in camera and was correct to only order limited disclosure of its contents.*

Defendant forfeited any challenge to the mere fact the trial court reviewed the CI file in camera. In the trial court, defendant stated the court should not utilize the *Pitchess* procedures when determining whether to order disclosure of anything in the CI file. But he did not object to the court conducting an in camera hearing to review the contents of the CI file or object to his and his attorney's exclusion from the hearing. Therefore, he cannot complain on appeal that the in camera hearing itself was improperly conducted. (See *People v. Bryant*, *Smith and Wheeler* (2014) 60 Cal.4th 335, 465 [claim of trial court error in conducting in camera hearings outside the defendants' presence forfeited because they did not object to the use of in camera procedures]; *People v. Valdez* (2012)

17

55 Cal.4th 82, 123 [claim of error from lack of notice and inability of defense counsel to participate in ex parte hearing about nondisclosure of witness identities forfeited because the defendant did not timely object on those grounds].)

Even if defendant did not forfeit such an argument, we find no error. "In general, a court 'has inherent discretion to conduct in camera hearings to determine objections to disclosure based on asserted privileges.'" (*People v. Bryant*, *Smith and Wheeler*, *supra*, 60 Cal.4th at p. 466.) When the prosecutor or a police agency objects to a defendant's discovery motion on the basis of the official information privilege or the CI privilege, the trial court is expressly authorized to conduct an in camera hearing to determine whether the documents should be disclosed. (*Ibid*.; *People v. Hobbs* (1994) 7 Cal.4th 948, 971; Evid. Code, § 915, subd. (b).) Defendant has not persuaded us that the trial court erred by excluding him and his attorney from "'an in camera hearing at which the [custodial of the records] . . . reveal[ed] sensitive and possibly privileged information.'" (*People v. Bryant*, *Smith and Wheeler*, at p. 466.)

More importantly, at defendant's request, we have conducted an independent review of the sealed transcripts of the in camera hearings and conclude the trial court properly limited its disclosure order to a redacted copy of the department's agreement with John and the information sheet detailing the two times he was paid for providing information in criminal investigations. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1229-1231.) The remaining contents of the CI file were either not relevant and material to impeaching John's testimony, or they were cumulative to the discovery materials the

18

prosecutor had already provided to defendant, so the trial court properly declined to order their disclosure.

*B.     Substantial Evidence Supports the Jury's True Findings on the Gang Special Circumstance and Gang Enhancements.*

Defendant does not challenge the sufficiency of the evidence to support his convictions for first degree murder, making a criminal threat, and false imprisonment. He does, however, argue the record does not support the jury's true findings on the gang special circumstance for count 1 and on the gang enhancement allegations for counts 2 and 3. Specifically, he contends the prosecutor did not establish the murder was committed with the specific intent to further the activities of COORS and did not establish that the criminal threat and false imprisonment were committed with the specific intent to promote, further, or assist in the criminal conduct by members of COORS. We conclude otherwise.

*1.     Additional background.*

a.      Expert testimony.

A gang expert testified violence is "the ultimate form of currency" for gang members because it earns them respect within the gang, from members of other gangs, and the wider community. Members also earn respect by committing crimes or "putting in work" for the benefit of the gang. Assaults, thefts, threats, and other "antisocial criminal behavior" done for the gang bolsters its reputation. If a gang member is "put in the hat," it means the member is "up for discipline, and somebody needs to handle that

19

discipline." The gang decides how to discipline its members, which might include "a simple assault or a homicide."

At the time of the murder, COORS had approximately 50 members in the Hemet/San Jacinto area. Its members wear red clothing, such as red suspenders, they have white power tattoos, such as swastikas and lighting bolts, and they use the numbers 14 and 88 in their tattoos, on their clothing, and on social media. The number 88 is significant in white power gang culture because the eighth letter of the Latin alphabet is H, and HH is short for "Heil Hitler." In addition, white power gangs subscribe to the writings of David Lane, a white supremacist sentenced to prison for murdering a Jewish disc jockey, who wrote about "88 precepts" the white culture must follow to survive. The number 14 refers to the "14 words of David Lane": "'We must secure the existence of our people and the future of our white children.'"

COORS members associate with, and sometimes cooperate with, members of rival California white power gangs such as, "Public Enemy Number 1," "Public Death Squad," and the "Hemet Valley Skins." COORS also associates with the Aryan Brotherhood prison gang. COORS engaged in a pattern of felonious criminal activity for the purposes of "the STEP Act" (the California Street Terrorism Enforcement and Prevention Act (§ 186.20 et. seq.)). The primary activities of the gang were violent assaults, felony weapons possession, sale of drugs, specifically methamphetamine, and auto theft.

Defendant stipulated he was an active participant in COORS at the time of the murder, he went by the moniker Bones, and he was aware that members of COORS were engaged in or had engaged in a pattern of criminal activity. He had tattoos of the words

20

"COORS Family Skins" and other white power tattoos such as, "SS" or "two lightning bolts," which are symbols of the "German secret police," writing in "Nordic" runes, the number "88," and a "Confederate flag hidden behind" skulls.[10]  A gang expert opined defendant and Heather were active members of COORS.

In the ranks or hierarchy of skinhead and white supremacist gangs, the Aryan Brotherhood is at the top.  Street level members of white supremacist gangs aspire to become members of the Aryan Brotherhood and try to achieve that goal by committing crimes such as selling drugs, collecting debts, and engaging in violent crimes including murder.  Members of the Aryan Brotherhood wear "rock" or "shamrock" ("green three leaf clover") tattoos.  It is a "bad mistake" for a nonmember to get a "shamrock" tattoo, and such an act could result in "violent consequences."

Answering a hypothetical question posed by the prosecutor, the gang expert opined that if a person were "in the hat" by the Aryan Brotherhood because he owed the gang $500 for drugs, and a member of COORS were to take that individual to an isolated place and shoot him once in the back and once in the back of the head, and later boast that he might "get a rock over this," the crime would further the activities of both COORS and the Aryan Brotherhood.  The benefit to COORS would be the same regardless of the amount owed by the victim and even if the member did not act under direct orders from the Aryan Brotherhood.  The COORS gang would benefit because

---

[10]  Popovich also had "white supremacist" tattoos, such as, "swastikas" and a tattoo of "Adolph Hitler."  The expert did not opine whether Popovich was a member of COORS.

21

"[i]ndividuals will now pay their drug debts on time; individuals now recognize that you do not mess with the COORS criminal street gang," and the killer's "status increases because he is willing to commit a homicide for the organization."

The expert also opined COORS would benefit if the killer in the hypothetical had threatened a witness to the shooting and told her to get back in the car or he would kill her. Gang members are more effective if they can commit crimes and not have witnesses come forward, so threatening a witness benefits the gang "both in reputation as well as generating income." Similarly, the expert opined COORS would benefit if the killer in the hypothetical had forced the witness into the car against her will and taken her to another location when she had asked to be let out. The gang would benefit because the witness would be frightened and less willing to testify, and anyone else in the vehicle would get the message that they had better not come forward.

           b.     Defendant's motion for directed acquittal on the gang special circumstance.

After the close of evidence, defense counsel argued there was insufficient evidence to support the special circumstance allegation and moved for directed acquittal. (§ 1118.1.) Addressing the four elements for the special circumstance as set forth in CALCRIM No. 736, counsel conceded the second and third elements were satisfied because defendant had already stipulated he was an active participant of COORS and knew COORS engaged in a pattern of criminal activity; and, solely for the purposes of his motion, counsel assumed the first element (that he killed Popovich) was also satisfied. Defense counsel argued, however, that the prosecutor had not established the fourth

22

element:  the murder was carried out with the specific intent to further the activities of COORS.  Counsel contended the evidence established, at most, that defendant "went rogue" and killed Popovich over a drug debt owed to the Aryan Brotherhood in the hopes of pleasing "the people in prison" and earning membership in the prison gang, but there was no evidence the killing was committed to benefit or further the activities of COORS.

The prosecutor responded there was evidence, in the form of expert testimony, that a murder committed by a member of COORS, "who is aspiring to bigger and better things in terms of the Aryan Brotherhood," benefits COORS because one of its members "achieves that status or that level," and the act "increases the status and the notoriety" of COORS as a gang to be feared.  Defendant replied that COORS might have received some secondary benefit from the murder, but there was no evidence defendant's intent was to bestow that secondary benefit.  "What he's doing is to benefit his own status to rise above to the larger organization."

The trial court denied defendant's motion.  The court concluded there was sufficient evidence defendant murdered Popovich with the intent to further the criminal activity of COORS, specifically its drug sales, because it told "everybody in that world, that community, . . . I'm willing to execute my friend for a drug debt, that's how serious I am in terms of completing an act that furthers the activity of COORS Skins."  The killing benefited the gang because, "if you're a member of or an associate of or aspiring to be a member of COORS Skins, and there's anything to do with drug sales that would constitute violating the code of that sales, you're going to think twice, because an active

23

member of COORS Skins executed" his best friend who was at least associated with members of COORS.

c.    Closing arguments.

During closing argument, the prosecutor was careful to tell the jury his burden on the special circumstance allegation included proving defendant killed Popovich to further the activities of *COORS*, not the activities of the Aryan Brotherhood. The prosecutor argued the murder furthered COORS's drug sales because the use of violence shows fear and increases the gang's ability to control its drug trade and ensure it gets paid. "[I]nvoking this fear about an unpaid drug debt . . . would benefit that criminal enterprise. If a person is not paying for their goods, there needs to be repercussions to make sure in the future they get that money." The prosecutor acknowledged defendant had a personal "side motivation" in killing Popovich because it would please the Aryan Brotherhood, the "big homies" to whom Popovich owed the debt, and defendant hoped he would "climb up the ranks." But the prosecutor argued that was not merely a "personal motivation," because a killing on behalf of the Aryan Brotherhood, "a notorious white supremacist prison gang," had the added benefit of "increas[ing] the notoriety and the respect and fear of COORS Family Skins, the defendant's personal gang."

With respect to the gang enhancement alleged for count 2, the prosecutor argued that threatening an eyewitness to a murder committed by a COORS member benefits the gang because it "tells her specifically, that you better not report this. You better not tell the police or anyone else what just happened. And invoking that fear and instilling that fear upon an eyewitness to such a crime obviously benefits the gang and it promotes that

24

criminal conduct by gang members." And for the gang enhancement alleged for count 3, the prosecutor argued that restraining Heather "invoke[ed] that fear in her," and "preventing her from seeking help and contacting anyone that would alert them to the defendant's crimes" benefited COORS because "fear . . . is the currency of all gangs."

Defense counsel countered that the prosecutor's arguments for the gang special circumstance were entirely reliant on the gang expert's testimony and, in turn, the expert's opinions were reliant on the faulty and unreliable testimony from John, Heather, and Richard. Counsel argued there was no evidence the killing of Popovich furthered the activity of COORS, as opposed to the Aryan Brotherhood.

### 2.   *Applicable law.*

"'In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." [Citation.]' [Citation.] The same test applies to the review of special circumstantial findings." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

"Section 190.2, subdivision (a)(22), sets forth the elements of the gang-murder special circumstance: '[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out *to further the activities* of the criminal street gang.'" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 611, italics added.) "Implicit in the statutory language that a murder be 'carried out to further the activities of the criminal street gang' (§ 190.2, subd. (a)(22)) is the requirement that the defendant specifically intended to further the activities of the criminal street gang." (*People v. Arce* (2020) 47 Cal.App.5th 700, 714.)

"There are two prongs to the gang enhancement under section 186.22, subdivision (b)(1), both of which must be established by the evidence. [Citation.] The first prong requires proof that the underlying felony was 'gang-related,' that is, the defendant committed the charged offense 'for the benefit of, at the direction of, or in association with any criminal street gang.' (§ 186.22, subd. (b)(1); [citations].) The second prong 'requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members."' ([citation]; § 186.22, subd. (b)(1).) . . . '[T]he prosecution's evidence must permit the jury to infer that the "gang" that the defendant sought to benefit, and the "gang" that the prosecution proves to exist, are one and the same.'" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 948.)

"Specific intent "'is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."'" (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 403.) "[W]e routinely draw inferences about intent from the

predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say." (*People v. Margarejo* (2008) 162 Cal.App.4th 102, 110.)

### 3. Analysis.

Defendant argues the evidence proved, at most, that his unsanctioned killing of Popovich, a fellow member of COORS or at least an associate of COORS, over a drug debt owed to the Aryan Brotherhood, was committed for "personal reasons" so defendant could reach his personal goal of becoming a member of that prison gang. He argues there was no evidence he intended to benefit COORS or that COORS derived any benefit whatsoever from the killing. Likewise, he contends there is no evidence he threatened and falsely imprisoned Heather to benefit COORS. We conclude otherwise.

Defendant does not dispute there was substantial evidence he had previously tried but failed to "tax" Richard on behalf of the Aryan Brotherhood. And he does not dispute there was substantial evidence from which a jury could find beyond a reasonable doubt that he murdered Popovich over a $550 drug debt owed to the Aryan Brotherhood. Without question, as the gang expert testified, the murder benefited the Aryan Brotherhood. But the evidence supported the expert's opinion that COORS was the primary beneficiary. The expert witness testified, and defendant does not dispute, that the primary activities of COORS included violent assaults, felony weapons possession, auto thefts, and the sale of methamphetamine. He also testified, and defendant does not dispute, that commission of such crimes by gang members bolsters the gang's reputation. And, in response to a hypothetical, the expert testified the killing benefited COORS

because people "will now pay their debts on time" and realize "you do not mess with the COORS criminal street gang." Moreover, the expert testified threatening and falsely imprisoning Heather, who witnessed the murder, sent a message to everyone not to report crimes committed by its members, and those acts benefited the gang by enhancing its reputation and ensuring its members can commit crimes with impunity. As our Supreme Court has recognized: "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22[, subdivision ](b)(1)." (*People v. Albillar* (2010) 51 Cal.4th 47, 63.) We see no reason why the same principle should not apply to the required finding that a murder was committed "to further the activities of the criminal street gang" for purposes of the special circumstance allegation. (§190.2, subd. (a)(22).)

Nor is defendant correct that the evidence established the murder benefited him alone. The gang enhancement and, by analogy, the gang special circumstance, may be imposed on "a lone actor" (*People v. Perez* (2017) 18 Cal.App.5th 598, 607), though at least one court has noted, "the typical close case is one in which one gang member, acting alone, commits a crime" (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198). Without a doubt, defendant personally benefited from committing the murder. His status in COORS and in the wider community was enhanced, and he clearly hoped his actions would please the Aryan Brotherhood and earn him membership in that gang. But nothing in the gang special circumstance and gang enhancements statutes, or in the cases interpreting them, mandates that the underlying crime be committed *solely* for the benefit

of a gang.  Otherwise, a jury could never find true the allegations when the defendant obtained even a slight personal benefit.  To analogize this case to the world of sport, specifically to the national pastime, the success of a minor league player who is signed to a major league team obviously benefits the player *personally* in terms of prestige, salary, etc.  But it has a residual or secondary benefit of enhancing the reputation of the minor league team as being an organization capable of training and grooming players who will one day make it to the big leagues.[11]

The evidence in this case supported the jury's necessary findings that defendant had the specific intent to further the criminal activities of COORS.  That he too personally benefitted, and that the gang whose ranks he aspired to join also benefitted, makes no difference.  Therefore, we affirm the gang special circumstance and gang enhancements.

C.      *The Optional Motive Instruction Read to the Jury (CALCRIM No. 370) Did Not Impermissibly Lower the Prosecutor's Burden of Proof on the Gang Special Circumstance.*

Defendant argues the trial court erred by instructing the jury that the People were not required to prove defendant had a motive to commit any of the charged offenses.  According to defendant, CALCRIM No. 370 conflicted with the instructions on the gang

---

[11] During argument over defendant's motion for directed acquittal on the special circumstance, the prosecutor made a similar analogy to college alumni who go on to succeed in business, specifically referring to the "collateral" reputational benefit to Harvard University from the success of its former student Mark Zuckerberg, founder of Facebook.

special circumstance, which informed the jury the prosecutor *was* required to prove

defendant was motivated by a desire to further the activities of a criminal street gang

when he committed the murder. We find no error.[12]

### 1.    *Additional background.*

Using CALCRIM No. 252, the trial court instructed the jury that the offense of

first degree murder and the special circumstance allegation "require proof of the union or

joint operation of act and wrongful intent" and, more particularly, first degree murder and

the gang special circumstance required proof of "a specific intent and/or mental state."

The trial court instructed the jury with CALCRIM No. 700 that the prosecutor had the

burden of proving the special circumstance allegation beyond a reasonable doubt; with

CALCRIM No. 705 that the prosecutor had to prove the defendant "acted with a

particular intent or mental state"; and with CALCRIM No. 736 that, inter alia, the

prosecutor had to prove defendant intentionally killed Popovich "to further the activities

of the criminal street gang." And, relevant here, the court instructed the jury with

CALCRIM No. 370 that the prosecutor was "not required to prove that the

---

**12** As the People correctly acknowledge, although defendant did not object at trial to the correctness of CALCRIM No. 370 or argue the instruction impermissibly lowered the prosecutor's burden of proof on the special circumstance allegation, we may review the claim of error because it implicates his substantial rights. (§ 1259; *People v. Johnson* (2015) 60 Cal.4th 966, 993.)

defendant had a motive to commit any of the crimes charged," but the jury could consider whether defendant had a motive.[13]

### 2. Analysis.

"The trial court must instruct the jury 'on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.'" (*People v. Anderson* (2018) 5 Cal.5th 372, 413.) We independently review whether an instruction correctly states the law. (*People v. Hamilton* (2009) 45 Cal.4th 863, 948.) "The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)

Defendant's argument is premised on the incorrect assumption the special circumstance allegation in this case required proof of *motive*. As noted, *ante*, the gang special circumstance requires proof beyond a reasonable doubt that an active participant in a gang intentionally committed a murder and *specifically intended* to further the gang's activities. (§ 190.2, subd. (a)(22); *People v. Arce*, *supra*, 47 Cal.App.5th at p. 714; *People v. Mejia*, *supra*, 211 Cal.App.4th at p. 611.)

---

[13] The court read CALCRIM No. 370 to the jury as follows: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict, you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show that the defendant is not guilty."

31

Motive and intent "are separate and disparate mental states.  The words are not synonyms." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.)  "Motive is not an element of a crime; rather, '[m]otive describes the reason a person chooses to commit a crime,' which 'is different from a required mental state such as intent or malice.'" (*People v. Thompson* (2016) 1 Cal.5th 1043, 1123, quoting *Hillhouse*, at p. 504.)  As Witkin explains:  "Motive is the *emotional urge* that induces a particular act.  It is different from intent, for a person may intend to steal property, or injure or kill someone, and will be guilty of the crime regardless of his or her motive (e.g., need, avarice, revenge, jealousy, fear)."  (1 Witkin, Cal. Criminal Law (4th ed. 2012) Elements, § 4, p. 263, italics added.)  "A bad motive is ordinarily not an element of a crime, and a good motive is ordinarily not a defense." (*Ibid.*)

The defendant in *People v. Fuentes* (2009) 171 Cal.App.4th 1133 (*Fuentes*) made a similar claim of instructional error as in this case, arguing CALCRIM No. 370 "conflicted with the instructions for the substantive offense of criminal street gang participation and the sentence-enhancement and special circumstance provisions related to criminal street gangs and lessened the prosecution's burden of proof on those issues." (*Fuentes*, at p. 1139.)  The appellate court disagreed.  "An intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent.  We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death.  Combined, the instructions here told the jury the prosecution must prove that Fuentes intended to further gang activity but need not show what motivated his wish to do so.  This was not ambiguous and there is no reason to think

32

the jury could not understand it. Fuentes claims the intent to further criminal gang activity should be deemed a motive, but he cites no authority for this position. There was no error." (*Id*. at pp. 1139-1140.)

*Fuentes* acknowledged the defendant's argument had "*superficial* attractiveness . . . because of the commonsense concept of a motive. Any reason for doing something can rightly be called a motive in common language, including—but not limited to— reasons that stand behind other reasons. For example, we could say that when A shot B, A was motivated by a wish to kill B, which in turn was motivated by a desire to receive an inheritance, which in turn was motivated by a plan to pay off a debt, which in turn was motivated by a plan to avoid the wrath of a creditor. That is why there is some plausibility in saying the intent to further gang activity is a motive for committing a murder: A wish to kill the victim was a reason for the shooting, and a wish to further gang activity stood behind that reason." (*Fuentes*, *supra*, 171 Cal.App.4th at p. 1140, italics added.) Nonetheless, the appellate court concluded the relevant instructions given to the jury "were well adapted to cope with the situation. By listing the various 'intents' the prosecution was required to prove (the intent to kill, the intent to further gang activity), while also saying the prosecution did not have to prove a motive, the instructions told the jury where to cut off the chain of reasons. This was done without saying anything that would confuse a reasonable juror." (*Ibid*.)

As here, the defendant in *Fuentes* relied on *People v. Maurer* (1995) 32 Cal.App.4th 1121 to support his claim of instructional error. *Fuentes* held *Maurer* "does not conflict with what we have said. *Maurer* held that the standard motive instruction

33

[(CALJIC No. 2.51)] was erroneous when given in conjunction with an instruction on section 647.6 [(CALJIC No. 16.440)], which prescribes punishment for '[e]very person who, motivated by an unnatural or abnormal sexual interest in children, engages in conduct with an adult whom he or she believes to be a child' where the conduct would be an offense if the other person really were a child. Since this offense includes a 'motivation' as one of its elements, a jury naturally would be confused by an instruction saying the prosecution need not prove the defendant's motive. Due to this peculiarity in the definition of the offense (the *Maurer* court called the section 'a strange beast' (*People v. Maurer*, *supra*, 32 Cal.App.4th at p. 1126)), the combination of instructions could not successfully tell the jury where to cut off the chain of reasons for the defendant's action which the prosecution had to prove. If section 647.6 referred to, say, persons acting 'with an intent to gratify an unnatural or abnormal sexual interest in children' instead of a motivation, the standard motive instruction would have been no more problematic than it is here." (*Fuentes*, *supra*, 171 Cal.App.4th at p. 1140.)

More recently, the defendant in *People v. Garcia* (2016) 244 Cal.App.4th 1349 argued instructing the jury with CALCRIM No. 370, in conjunction with CALCRIM No. 1403 on the limited use to be given evidence of gang activity, "would cause the jury to confuse the intent required to prove the gang enhancements with the separate mental state of motive." (*Garcia*, at p. 1364.) Our colleagues in Division One of this appellate district found no error. "Like the court in *People v. Fuentes* (2009) 171 Cal.App.4th 1133, 1139-1140 . . . , we find no merit in this argument. The instructions, as given, adequately distinguish the intent the jury must find from evidence of motive that might be

34

relevant in determining whether the defendant acted with the required intent. (See *ibid*.)" (*Garcia*, at p. 1364.)

We agree with the reasoning in *Fuentes*, *supra*, 171 Cal.App.4th 1133, and adopt it as our own. The instructions in this case correctly informed the jury that the prosecutor was required to prove the elements of the gang special circumstance beyond a reasonable doubt; those elements included the specific *intent* to further the activities of a criminal street gang; and the prosecutor was not required to also prove defendant had a motive for committing the murder, though the jury could consider his motive. We must presume the jury understood and followed the instructions as given. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1024.) "[T]he instructions as a whole did not use the terms 'motive' and 'intent' interchangeably, and therefore there is no reasonable likelihood the jury understood those terms to be synonymous." (*People v. Cash* (2002) 28 Cal.4th 703, 739.)

>    D.    *On Remand the Trial Court Shall Strike Defendant's Three One-year Prior Prison Term Enhancements.*

Finally, defendant argues, and the People concede, defendant should benefit from an ameliorative statutory amendment limiting one-year sentence enhancements under section 667.5, subdivision (a), to prior convictions for violent sex offenses, of which defendant has none. We agree.

On October 8, 2019, the Governor signed into law Senate Bill No. 136 (2019-2020 Reg. Sess.) to amend Penal Code section 667.5, subdivision (b) (Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020). At the time defendant was sentenced, "a one-year sentence

enhancement under section 667.5, subdivision (b) [was] applied 'for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony.' (§ 667.5, subd. (b).)" (*People v. Buycks* (2018) 5 Cal.5th 857, 889.) But effective January 1, 2020, the one-year enhancement only applies to prison terms served for conviction of a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (Pen. Code, § 667.5, subd. (b).)

Senate Bill No. 136 is an ameliorative amendment that applies retroactively to nonfinal judgments, such as this one. (*People v. Cruz* (2020) 46 Cal.App.5th 715, 738-739 [concluding Sen. Bill. No. 136 applies retroactively to nonfinal judgments]; *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-343 [same]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682 [same].) Therefore, we remand for the trial court to strike defendant's three one-year prior prison term enhancements.

## IV.

## DISPOSITION

The cause is remanded for resentencing. The trial court shall exercise its discretion in the first instance and determine whether to sentence defendant for the true findings on the gang enhancement allegations for counts 2 and 3; sentence defendant but strike the punishment for the true findings in the interest of justice and state reasons for doing so on the record; or dismiss the gang sentence enhancements entirely in the interest of justice. (See, *ante*, fn. 2.) The trial court shall also strike defendant's three one-year prior prison term enhancements.

36

In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

SLOUGH
J.